**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4010-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MAHDI A. WRIGHT,

    Defendant-Appellant.

_____

Argued May 28, 2026 – Decided June 15, 2026

Before Judges Mawla and Marczyk.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 22-08-1913.

Alexandra Marek, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Alexandra Marek, of counsel and on the briefs).

Margaret Myaskovskaya, Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens II, Essex County Prosecutor, attorney; Margaret Myaskovskaya, of counsel and on the brief).

PER CURIAM

Defendant Mahdi A. Wright appeals from his conviction and sentence for the murder of James Shaw, Jr. We affirm defendant's convictions but remand his sentence for reconsideration after the trial court adjudicates his request for new counsel.

On February 16, 2022, Newark police responded to a shooting at the intersection of Mapes Place and Shephard Avenue. Police found Shaw bleeding from a gunshot wound to the back of his head. Two nine-millimeter shell casings were recovered from the scene. Shaw later succumbed to his injuries.

There were no eyewitnesses to the shooting. However, video surveillance footage showed a person wearing all black walk up behind Shaw before the shooting and then run down the street toward Mapes Avenue and get into a black Chevy Impala. The front of the vehicle was distinctive; it was damaged and had no license plate. The shooter entered the vehicle's passenger side. Various video cameras captured the Impala leaving the area of the crime and recorded its travel to Elizabeth, where a passenger, wearing all black, exited the vehicle and entered a home on Port Avenue. Police later determined the vehicle was registered to Ashad Garat.

A Ring doorbell camera at the Port Avenue home captured the face of the person entering the home. Defendant and his family lived on the home's second

floor. Several minutes after entering the home, a person resembling defendant exited and drove away in the Impala.

On February 19, 2022, police located the Impala on Mapes Avenue, being operated by a woman. Lead investigator, Essex County Prosecutor's Office (ECPO) Detective Al-Jerome Burnett-Crawford, interviewed the woman. A search warrant for the vehicle was executed on or about February 20, 2022. The ECPO recovered a backpack, six rounds of ammunition, and a Ruger gun box from the Impala.

On March 15, 2022, defendant's mother identified him from still photographs taken from the Ring camera footage. A search warrant for the Port Avenue home was executed the same day. The clothing observed being worn the day of the shooting was recovered, as well as footage from the Ring camera. Police also recovered a video from a grocery store, showing Garat appearing to describe a shooting to another individual. Defendant was not seen in the clip.

Police arrested defendant on May 10, 2022. He was indicted on: first-degree murder, N.J.S.A. 2C:11-3(a)(1) (count one); second-degree unlawful possession of weapon(s), N.J.S.A. 2C:39-5(b)(1) (count two); and second-degree possession of weapon(s) for unlawful purposes, N.J.S.A. 2C:39-4(a)(1) (count three).

A-4010-23

The State's case was entirely circumstantial.  It presented testimony from seventeen witnesses, including several experts, video and photo evidence, and additional physical evidence.

Newark Police Officer Emilio Santiago testified he was the first on the scene of the shooting, having been flagged down by an individual.  After securing the scene, officers canvassed the area for gun shell casings and possible witnesses.  Officer Santiago spoke with Gewayne Blake, who had heard the shooting and saw the aftermath.

Defendant's mother testified she identified defendant from several still photographs taken from the video recovered by police.  Defendant's landlord also identified him from the Ring camera footage.

Janaisha Greene testified she was sitting in the passenger seat, driving around with her friend, Destiny Baker, delivering food.  There was also a five-year-old child in the car.  At the time of the shooting, Greene was stopped at the corner of Mapes Place and Shephard Avenue because she was calling Shaw to see where he was.  Shaw approached Greene's car and then stepped away after they conversed.  After Shaw stepped away, he was shot.  Greene did not see the shooter's face but saw them turn towards Shaw and heard shots ring out.  She noticed a person wearing all black.

4

Blake testified he was in his home on Shepard Avenue, when he heard gun shots. He saw someone running to a car and get in it, before the car made a U-turn and drove away. The person wore all black, but Blake could not see what they looked like. He described the car as a black Chevy Impala.

At the time of the shooting, Detective Matthew Schneiderman worked for the ECPO Crime Scene Unit. He collected evidence and obtained a search warrant for defendant's home. Detective Schneiderman collected and photographed a gray hoodie. A red sweatshirt was also taken from the home.

ECPO Detective Kevin Lalicon testified he executed a search warrant on Garat's Impala. He discussed the evidence recovered from it, including a black-hooded sweatshirt and the Ruger gun box.

Detective Burnett-Crawford described the evidence gathered and the witnesses he interviewed. He explained a search of Shaw's home disclosed nothing of evidentiary value. However, after canvassing the scene, he recovered video evidence tracing the car's movement.

Detective Burnett-Crawford's testimony explained the photo and video evidence for the jury, including: the vehicle; its color; direction of travel; and the lack of a front license plate. He also explained other videos, which showed a person in dark clothing and the direction they traveled, walking to the scene

A-4010-23

and then running from it.  Detective Burnett-Crawford noted the individual wore dark clothing with white-trimmed shoes.  He testified an image appeared to show the individual holding an object in their left hand, which the detective circled for the jury.  The detective circled another image, showing a person extending their arm.  He described the video footage showing Greene, Baker, and Shaw talking, and Shaw standing where he was shot.

Detective Burnett-Crawford then discussed the footage tracking the dark-colored vehicle, which he identified as a Chevy Impala, as it drove from the crime scene towards Elizabeth.  He explained the vehicle's rear license plate showed it was registered to Garat, who lived on Mapes Avenue in Newark, and the process undertaken to recover the vehicle.  The vehicle was tracked using license-plate-reader technology and footage showing it turn onto Port Avenue in Elizabeth.

Detective Burnett-Crawford explained one video captured an individual exiting the vehicle, opening a rear door, and retrieving what appeared to be a red article of clothing.  A zoomed-in still photo depicted a dark-clothed individual with white-trimmed shoes and a mask or hat on their head, holding a red-hooded sweatshirt.  Another video showed the individual later exiting the car on Port Avenue and running towards and entering a residence on Port

A-4010-23

Avenue. A video and several images showed a person leaving the residence wearing dark clothing. Video footage also showed a person wearing a red sweatshirt entering a dark-colored Chevy Impala.

Detective Burnett-Crawford testified a search warrant was executed on an apartment in the Port Avenue residence. The detective also testified about search warrants executed for Garat's home, Instagram account, and mobile phone number.

On cross-examination, the defense pointed out some of the images and videos presented by the State depicted only Garat. Detective Burnett-Crawford also testified he could not tell what Garat said in the video showing him allegedly re-enact the shooting. He conceded, other than defendant being identified on the Ring camera footage, no one had identified him at the scene.

Notably, the defense did not object to any of the video footage during the detective's testimony. Its only objection was to the State's summary chart of the camera locations and timing.

Before summations, the trial judge addressed the defense's concern the identification charge did not properly address the fact no one had identified defendant as the shooter. The judge noted identification remained an issue in the case. So, he crafted his own charge, which read as follows:

The burden of proving the identity of the person who committed the crimes is upon the State. For you to find this [d]efendant guilty, the State must prove, beyond a reasonable doubt, that this [d]efendant is the person who committed the crimes. The [d]efendant has neither the burden nor the duty to show that the crimes, if committed, were committed by someone else, or to prove the identity of that other person. You must determine, therefore, not only whether the State has proven each and every element of the offense charged beyond a reasonable doubt, but also, whether the State has proven beyond a reasonable doubt that this [d]efendant is the person who committed them.

Defense counsel agreed to the charge.

The defense summation focused on the argument there were no eyewitnesses and the State failed to prove defendant was the shooter. Also, none of the physical evidence collected was connected to defendant. The defense pointed to the fact there could have been someone else on Shephard Avenue during the shooting, that Garat was also present, and the weapon and ammunition were in his car. Based on the State medical examiner's testimony, there was no evidence the person in dark clothing was the shooter because Shaw's wounds were inconsistent with being shot at close range.

The State's summation was predicated on Baker's testimony there was no third-party present during the shooting, the identification of defendant by his mother, and the trail of "crumbs" defendant left from the shooting to his home,

which could only mean he was the shooter. It led the jury through the video evidence, tracking defendant and the Impala through the streets of Newark and Elizabeth. The State argued the videos showed defendant, wearing a red-hooded sweatshirt, getting into the Impala, and at some point, changing into Garat's black-hooded sweatshirt[1] before shooting Shaw. A video showed defendant opening the trunk of the vehicle after reaching the Port Avenue residence, and there was no evidence anyone else accessed the trunk at the time. The State argued defendant's claim Garat committed the crime did "not hold water" because Garat's re-enactment of Shaw's death did not properly show how Shaw fell. What mattered was defendant had the shooter's clothing and could have changed in the car, regardless of who was driving.

Following the parties' summations, the trial judge instructed the jurors. Relevant to the issues here, he repeated his initial instruction, explaining comments by counsel were not considered evidence. The judge also stated defendant argued the State had not proven he was the shooter and then read the identification charge he had previously fashioned. Following the jury

---

[1] The State pointed to defendant and Garat's Instagram account posts, showing them together and Garat wearing the same black hoodie.

A-4010-23

instructions, the judge asked the parties if there was any objection to the jury instructions. Neither objected and the jury began its deliberations.

During it deliberations, the jury asked to see: video of defendant outside the Port Avenue residence; video of Garat in the grocery store; Blake's testimony; and a list of the witnesses who testified. The jury found defendant guilty on all three counts.

At the sentencing, following counsel's appearances, defendant interrupted and said: "I will be firing my attorney on the record." The judge noted defendant's request was made too late and proceeded with the sentencing.

Defense counsel argued the judge should apply mitigating factors seven, nine, and fourteen. She pointed out, contrary to the pre-sentencing report, defendant had completed his G.E.D. program. Defendant was gainfully employed during high school and had no prior record. This was his first indictable conviction. Counsel pointed out defendant was twenty-one years old at sentencing and eighteen at the time of the offense. The defense also submitted several letters attesting to defendant's character and family support. Counsel requested the court sentence defendant to the statutory minimum of thirty-years. After his attorney finished speaking, the judge afforded defendant the

opportunity to make a statement. Defendant said: "I would like to fire [both of my attorneys] and their whole law firm. . . . That's all I've got to say."

Shaw's family members spoke at length, after which the State presented its sentencing argument. The State recounted the fact Shaw was unarmed when defendant shot him in the back of the head. The shooting took place in front of Greene, Baker, and a young child, which the State argued showed "complete[,] wanton disregard for their safety, as well as . . . the intent to cause grave harm to . . . Shaw." The video evidence "demonstrated [the] clear steps taken to show . . . [defendant] knew exactly what he was doing on that day." The State had proven defendant got into the car and "chang[ed] . . . into more neutral clothing, putting a mask on to try and conceal his identity . . . . [H]e went directly from [the crime scene] . . . back to his house, changing his clothes again in an attempt to hide what he had done."

When the State observed defendant had shown no remorse nor taken responsibility for his actions, defendant interjected by stating the State was lying. The State urged the court to find aggravating factors one, two, three, and nine, and give little weight to mitigating factor fourteen. Defendant continued to interject and alleged the State was lying.

A-4010-23

The judge began by noting he was "very familiar" with defendant's case, having presided over the trial and read "every word" of the presentencing report. He noted defendant's age, level of education, and work history. The judge also observed defendant had six juvenile petitions filed against him and in 2020, had successfully completed a diversionary program related to a third-degree aggravated assault, third-degree conspiracy to commit aggravated assault, and third-degree endangering an injured victim offense.

Defendant was twice arrested as an adult, and the murder of Shaw represented his first indictable conviction. In 2023, a bench warrant was issued for him by the Law Division for a theft offense and he had an outstanding warrant for a juvenile case involving the receipt of stolen property, obstructing justice, and resisting arrest. Given this history, the judge declined to find mitigating factors seven or nine applied as defendant had not led a law-abiding life. However, mitigating factor fourteen applied because of defendant's youth.

The judge did not find aggravating factors one and two applied because he believed the law already accounted for the heinous nature of defendant's crimes. Aggravating factor three applied because defendant had "significant anti-social behavior," which convinced the judge he was at risk of committing another crime. The judge found aggravating factor nine applied because there

12

was a need to deter defendant and others from violating the law. He concluded the aggravating factors "substantially outweigh[ed]" the mitigating factor.

The trial judge also noted he gave defendant the opportunity to speak and "[t]he only thing [he] wanted to say was, [']I want to get rid of my attorneys.[']" The judge "didn't hear anything about being the least bit remorseful." Defendant interrupted, stating: "So, because I didn't say nothing, I'm not remorseful[?]" The judge continued, noting "[t]he jury spoke quite resound[ingly]. It was a . . . relatively quick verdict. And the evidence in this case was really overwhelming. There was little doubt about [defendant's] guilt."

The judge sentenced defendant to forty-eight years in prison, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, on count one, and a concurrent term of eight years on count two, with four years of parole ineligibility under the Graves Act, N.J.S.A. 2C:43-6(c). Count three was merged with count one.

Defendant raises the following points on appeal:

POINT I

DEFENDANT'S CONVICTIONS MUST BE REVERSED BECAUSE THE DETECTIVE IMPROPERLY NARRATED VIDEO SURVEILLANCE FOOTAGE IN VIOLATION OF [STATE V.] WATSON.[2] (Not raised below).

---

[2] 254 N.J. 558 (2023).

A.     The Detective Impermissibly Provided Continuous and Running Commentary In Response to Non-Focused Questions.

B.     The Detective Impermissibly Provided His Opinion About the Contents of Videos and Photographs.

C.     The State's Direct Examination Elicited Opinions From the Testifying Detective that Improperly Suggested to the Jury Who the Suspected Shooter and Suspect Vehicle Were.

D.     The Admission Of This Improper Narration Testimony Was Plain Error, Requiring Reversal.

POINT II

THE TRIAL COURT COMMIT[T]ED PLAIN ERROR BY FAILING TO INSTRUCT THE JURY ON THIRD-PARTY GUILT.  (Not raised below).

POINT III

IMPROPER TESTIMONY WAS ELIC[I]TED FROM OFFICERS INDICATING THE USE OF SEARCH WARRANTS IN THE INVESTIGATION[,] WHICH IMPROPERLY BOLSTERED THE STATE'S CASE AND PREJUDICED THE DEFENDANT.  (Not raised below).

POINT IV

THE PROSECUTOR MADE MULTIPLE IMPROPER REMARKS     DURING     SUMMATION     THAT AMOUNTED             TO             PROSECUTORIAL

14                                                    A-4010-23

MISCONDUCT THAT DEPRIVED DEFENDANT OF A FAIR TRIAL.  (Not raised below).

POINT V

THE CUMULATIVE EFFECT OF THE LEGAL ERRORS DEPRIVED DEFENDANT OF A FAIR TRIAL.  (Not raised below).

POINT VI

DEFENDANT'S SENTENCE MUST BE VACATED AND REMANDED FOR RESENTENCING BECAUSE DEFENDANT WAS DENIED AN OPPORTUNITY TO OBTAIN NEW COUNSEL AND BECAUSE HIS SENTENCE WAS EXCESSIVE.  . . .

A.     The Matter Must Be Remanded for Resentencing Because Defendant Fired His Private Attorneys On the Record At Sentencing.

B.     The Court Erred in its Weighing of Aggravating and Mitigating Factors, Resulting in an Excessive Sentence.

I.

In Point I, defendant claims there was little evidence he was the shooter and no direct evidence linking him to the shooting.  Instead, the State succeeded in using surveillance videos to link him to the crime through Detective Burnett-Crawford's improper narration testimony.

Defendant asserts Detective Burnett-Crawford gave a "continuous" and "running commentary" on the footage, which the jury could have evaluated on

15

A-4010-23

its own. He also offered his subjective interpretations of disputed facts even though he was not an eyewitness. These included whether: the person wearing all black was the shooter; the object in their hand was a gun; and the person in the red-hooded sweatshirt was the same as the one in black. Defendant argues the detective's testimony regarding the videos tracking the vehicle improperly suggested each video showed the same person in the same vehicle, yet the videos were fragmented. Defendant contends the detective's testimony was plain error because it deprived him of a fair trial, and we must reverse his convictions.

Errors not raised at the trial level are reviewed for plain error. R. 2:10-2; State v. Singh, 245 N.J. 1, 13 (2021). "The mere possibility of an unjust result is not enough." State v. Funderburg, 225 N.J. 66, 79 (2016). "In the context of a jury trial, the possibility must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. G.E.P., 243 N.J. 362, 389-90 (2020) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)).

The plain error standard requires a determination of: "(1) whether there was error; and (2) whether that error was 'clearly capable of producing an unjust result,' R. 2:10-2; that is, whether there is 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" State v.

16

Dunbrack, 245 N.J. 531, 544 (2021) (omission in original) (quoting Funderburg, 225 N.J. at 79).  "To determine whether an alleged error rises to the level of plain error, it 'must be evaluated in light of the overall strength of the State's case.'"  State v. Clark, 251 N.J. 266, 287 (2022) (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018)) (internal quotation marks omitted).  The defendant bears the burden of proving the plain error.  State v. Santamaria, 236 N.J. 390, 404-05 (2019).

"[W]hen counsel does not make a timely objection at trial, it is a sign 'that defense counsel did not believe the remarks were prejudicial' when they were made."  State v. Pressley, 232 N.J. 587, 594 (2018) (quoting State v. Echols, 199 N.J. 344, 360 (2009)).  "[T]rial errors that 'were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal. . . .'"  State v. A.R., 213 N.J. 542, 561 (2013) (omission in original) (quoting State v. Corsaro, 107 N.J. 339, 345 (1987)).

Watson held an individual who did not witness an event may still testify to an event captured on video so long as the testimony is objective.  254 N.J. at 569, 599.  Narration testimony can be helpful to jurors to "better understand video evidence and aid them in 'determining a fact in issue.'"  Id. at 601 (quoting N.J.R.E. 701(b)).  This includes instances of "chaotic or confusing recorded

17

events" or where jurors are tasked with tracking "individual movements from frame to frame." Ibid. However, a narration witness may not provide "continuous commentary during a video . . . based only on viewing the recording," and the State must ask "focused questions designed to elicit specific, helpful responses"; the witness may not offer opinions on the content, and only give "objective, factual comments"; they should also avoid disputed factual issues; and any inferences from the videos should be left to summation. Id. at 603-04. An example of proper narration testimony is "draw[ing] attention to a distinctive shirt or a particular style of car that appear in different frames, which a jury might otherwise overlook." Id. at 604.

A trial court's determination of such issues is subject to an abuse of discretion review. Id. at 602. Additionally, if no objection was made during trial, "the error will be disregarded unless a reasonable doubt has been raised whether the jury came to a result that it otherwise might not have reached." State v. R.K., 220 N.J. 444, 456 (2015).

Videos that form the basis of an officer's narration testimony on the areas of interest from their investigation are generally permissible. State v. Allen, 254 N.J. 530, 548-49 (2023). Additionally, when a narration witness does not identify the suspected shooter as the defendant, then reversal is not required,

even if it is connected to testimony about a suspect's clothing being the same as a shooter.  See Singh, 245 N.J. at 17-18.

Pursuant to these principles and having considered Detective Burnett-Crawford's testimony and the record, we conclude the narration testimony was valid in its purpose and objective, and it did not violate Watson.  At the outset, we note, although Detective Burnett-Crawford's testimony as lead investigator was important, the State presented several other witnesses who testified about defendant's crimes, the crime scene, and the places investigators searched, which also gave the jury sufficient evidence to reach a guilty verdict.  The purpose of Detective Burnett-Crawford's testimony was to explain the nature of his investigation and how he tracked the shooter from the scene to the Port Avenue residence by following the Impala.

The detective's testimony could hardly be characterized as a running commentary.  The State segmented the presentation by asking him to explain what each piece of evidence, which included several parts of footage, showed as it was introduced—without objection—for the jury's consideration.  Also, the State did not ask open-ended, unspecific questions, but instead queried the detective to explain the evidentiary value of what he identified in the several videos adduced into evidence.

The detective never offered a subjective opinion to the jury. He did not say the person seen in the video wearing black, and then red, was defendant nor did he express defendant was in the car. Instead, he drew the jury's attention to what the individual in the videos was wearing and how those pieces of clothing connected to the clothing found in defendant's home. The detective testified the person raised their hand and had an object in it but never identified the person as defendant or said the object was a gun. Greene was the one who testified there was a gun. The detective did not improperly identify the vehicle as the same one in every video but instead demonstrated it was the same vehicle by noting its front-end damage and missing license plate. In sum, the jury was left to decide the identity of the person in the video, whether they were the shooter, and whether defendant was the same person.

We note the parties and the trial judge were also keenly aware of the rules set forth in Watson because the judge twice reminded the State to avoid improper narration. The State adhered to the judge's instructions by either pivoting to a different subject or asking the detective focused questions eliciting helpful responses. Notably, the judge's redirection was of his own volition. The defense never raised a concern regarding the nature of Detective Burnett-Crawford's testimony. Our review of the testimony shows the defense did not have cause

20

to object because the testimony was consistent with <u>Watson</u>, and where it had the potential to stray, the judge acted preemptively to keep it in line.

For these reasons, we reject defendant's claim the detective's testimony deprived him of a fair trial. The testimony did not constitute plain error and defendant's arguments otherwise lack merit. <u>R.</u> 2:11-3(e)(2).

II.

In Point II, defendant argues the trial judge failed to provide instructions on the defense's theory of third-party guilt. He reminds us there were no eyewitnesses or direct evidence tying him to the shooting. The State did not know who drove the Impala or how many occupants were in it, and the footage tracking the vehicle was not continuous. On the other hand, there was substantial evidence suggesting Garat may have been the shooter, including the items recovered from the Impala, which was registered to him, and a video of him re-enacting the shooting.

Given the paucity of the State's evidence, the jury should have been properly instructed on how to consider Garat's guilt and defendant's innocence. Defendant argues the lack of a third-party guilt instruction requires us to reverse and grant him a new trial.

A-4010-23

"When identification is a 'key issue,' the trial court must instruct the jury on identification, even if a defendant does not make th[e] request." State v. Cotto, 182 N.J. 316, 325 (2005) (quoting State v. Green, 86 N.J. 281, 291 (1981)). A lack of instruction can constitute plain error. Id. at 326. This determination depends on the strength and quality of the State's corroborative evidence and not whether a defendant's argument is convincing. Ibid. A trial judge must give "'specific instruction' even when [a] defendant's misidentification argument is 'thin.'" Ibid. (quoting State v. Davis, 363 N.J. Super. 556, 561 (App. Div. 2003)).

There was no plain error in the jury instructions here. As we recounted, the judge instructed the jury on third-party guilt by telling them it was the State's burden to prove the identity of the shooter and prove beyond a reasonable doubt defendant committed the crimes. The judge squarely addressed the issue of third-party guilt when he invited the parties to craft the jury instructions themselves. When they could not, he crafted his own instruction, to which neither party objected.

The jury instruction matched the quality and strength of the State's circumstantial case and evidence. Indeed, numerous videos tracked the vehicle carrying the shooter from Newark to defendant's home in Elizabeth. The videos

22

showed the shooter wearing distinctive dark-clothing and white-trimmed shoes. Also, defendant's mother and landlord identified him from the Ring camera footage. The weight of this evidence was far greater than the limited facts in evidence tying Garat to the incident.

We are satisfied the instruction given was sufficient and could permit the jury to conclude someone other than defendant committed the crimes. Although the defense never presented any evidence, its summation, informed by its cross-examination, robustly argued Garat was the shooter. This is further evidenced by the jury's questions and evidence it asked to review during deliberations. We are unconvinced the jury was in the dark regarding the third-party guilt issue or that it did not understand its options so as to constitute plain error.

### III.

In Point III, defendant argues the State improperly bolstered its case by implying by virtue of granting the search warrant, the judge who signed it considered the State's case strong. Defendant also notes he was prejudiced by the State's reference to other search warrants, which had nothing to do with him, namely, Garat's vehicle and phone. He asserts even though the State can reference a search warrant to show police actions were authorized, here there were repeated references to warrants, which constituted plain error because the

23

prejudice to defendant outweighed the probative value of mentioning the search warrants.

Search warrants may be referenced in witness testimony to demonstrate "the police had lawful authority [to] carry[] out a search to dispel any preconceived notion that the police acted arbitrarily." State v. Cain, 224 N.J. 410, 435 (2016). But "[a] prosecutor . . . may not repeatedly mention that a search warrant was issued by a judge if doing so creates the likelihood that a jury may draw an impermissible inference of guilt." Ibid.

Recently, the Court revisited and reiterated Cain's principles in State v. Butler. 263 N.J. 2, 28-29 (2026). Butler emphasized when the legality of a warrant is uncontested, repeated references to warrants issued by a judge can mislead juries. Id. at 28. The inquiry into the propriety of such references focuses on "their purpose and effect," not the number. Id. at 29. Although the State in Butler made repeated references to the defendant as the target of the warrant over the defense's objections and failed to abide by a pre-trial agreement to mention only "lawful searches," the Court concluded there was no plain error. Id. at 29-30. This was because there was other evidence supporting the defendant's conviction on drug charges and the jury had acquitted him on

24

weapons charges evidencing it was not improperly influenced by the references to the warrant. Id. at 30.

Pursuant to these principles, we discern no plain error in the State's references to the search warrant for defendant's home. Although the defense did not contest the validity of the warrant, the references to it did not mention defendant as the target. Rather, they were to demonstrate the warrant as another step in the investigation leading from the crime scene to the home in Elizabeth, and to explain the evidence collected. The State did not unnecessarily or repeatedly reference the warrants. The testimony regarding the warrants never referenced the warrant judge or their role in granting the warrants and instead, conveyed the police had lawful authority to search the residence. The testimony did not invite an impermissible inference of defendant's guilt and did not constitute plain error.

## IV.

In Point IV, defendant argues the State's summation contained prejudicial comments unsupported by the record, which deprived him of a fair trial. Defendant claims the State improperly argued no one but defendant had access to the Impala's trunk or the gun box found within it. However, the record showed: Garat also had access since it was his car; the woman driving the

A-4010-23

vehicle when police executed the warrant for the car presumably had access to the trunk; and the vehicle's driver at the time of the shooting, who was never identified, also presumably had access to the trunk.

Defendant also claims the State argued he changed from a red hoodie to a black hoodie in the vehicle without any factual support. There were also many other gaps in the evidence, which the State improperly filled by supposition during its summation, including: how many people were in the car; whether anyone wearing a red hoodie exited the vehicle at any time; and whether the surveillance videos captured the same Impala.

"[P]rosecutors are expected to make 'vigorous and forceful' presentations during . . . summations." Butler, 263 N.J. at 22 (quoting State v. Williams, 244 N.J. 592, 607 (2021)). They are "afforded considerable leeway" in summations so long as they are "reasonably related to the scope of the evidence presented." Ibid. (quoting Williams, 244 N.J. at 607). Our role is to "weigh 'the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial.'" Ibid. (quoting Williams, 244 N.J. at 608). This involves considering "the nature of the asserted error, the responses of counsel and the trial court, and any resulting harm." Ibid. The alleged error is assessed based on the strength of the State's evidence. Clark, 251 N.J. at 287. Reversal is required only if it

sufficiently raises "a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached." Funderburg, 225 N.J. at 79.

Initially, we note the defense did not object to the State's summation. We also reiterate the judge instructed the jury that counsel's arguments were not evidence. "One of the foundations of our jury system is that the jury is presumed to follow the trial court's instructions." State v. Burns, 192 N.J. 312, 335 (2007).

The State did not need to prove who the driver was or how many people were in the vehicle to prove defendant was the shooter. Regardless, defendant's issue with the State's assertions relating to his access to the trunk ignores the context of the remark and the evidence presented linking the remark with the evidence. The State never said defendant was the only one with access to the trunk. Instead, it remarked there was no evidence anyone after the shooting had access to the trunk, which showed the alleged shooter opening it. This was reasonably within the scope of the evidence presented and related to the State's theory defendant was the shooter, which was predicated not on the access to the trunk alone, but the shooter's clothing and the path they followed to and from the shooting and the route back to defendant's home.

The remark about the shooter changing from a dark-colored sweatshirt to a red-hooded sweatshirt was not plain error because it did not provide missing

27

pieces of evidence but instead connected the State's theory to the evidence presented at trial. The remark was based on the video evidence, which the State painstakingly walked the jury through during summation.

V.

Defendant argues the cumulative effect of all the errors outlined above requires reversal. We are unconvinced.

Reversal on cumulative error grounds exists when the "effect of a series of errors is so great as to deprive a defendant of a fair trial." State v. Burney, 255 N.J. 1, 29 (2023). This does not occur by "simply . . . counting mistakes," but rather discerning whether "the probable effect of the cumulative error was to render the underlying trial unfair." Ibid. (first quoting Pellicer ex rel. Pellicer v. Saint Barnabas Hosp., 200 N.J. 22, 55 (2009); and then quoting State v. Wakefield, 190 N.J. 397, 538 (2007)).

Having considered defendant's arguments in light of the record, we discern no individual prejudicial error, let alone a cumulative effect so great as to have deprived him of the constitutional right to a fair trial. "[A] defendant is entitled to a fair trial, [but they are] not entitled to a perfect trial, 'for there are no perfect trials.'" United States v. Payne, 944 F.2d 1458, 1477 (9th Cir. 1991)

(quoting Brown v. United States, 411 U.S. 223, 231-32 (1973)). Defendant received a fair trial.

## VI.

Defendant challenges his sentence in several respects. He claims the judge improperly denied him the right to the counsel of his choice when he announced he wanted to fire his attorneys and the judge rejected his request without understanding the reasons why. Defendant argues the sentence, which exceeds the statutory minimum by eighteen years, was unjust because the judge failed to examine mitigating factors seven and nine. The judge also improperly concluded defendant lacked remorse and punished him for maintaining his innocence. The application of aggravating factor three was erroneous because: the judge considered defendant's juvenile petitions, which did not result in adjudications; the judge ignored this was defendant's only indictable conviction; and prior dismissed charges could not be considered for sentencing purposes where the underlying facts had not been adjudicated.

## A.

We review a trial judge's decision regarding a defendant's request to halt the proceedings to retain new counsel for an abuse of discretion. State v. Maisonet, 245 N.J. 552, 565-66 (2021). This is because "the right to retain

counsel of one's own choice is not absolute, and 'cannot be insisted upon in a manner that will obstruct an orderly procedure in courts of justice and deprive such courts of the exercise of their inherent powers to control the same.'" State v. Furguson, 198 N.J. Super. 395, 401 (App. Div. 1985) (citations omitted) (quoting Smith v. United States, 288 F. 259, 261 (D.C. Cir. 1923)).

In considering whether to adjourn a matter for a defendant to seek new counsel, "the trial court must strike a balance between its inherent and necessary right to control its own calendar and the public's interest in the orderly administration of justice, on the one hand, and the defendant's constitutional right to obtain counsel of [their] own choice, on the other." Maisonet, 245 N.J. at 566 (quoting State v. Hayes, 205 N.J. 522, 538 (2011)). Maisonet adopted "a series of factors" in order "[t]o help trial judges balance the relevant interests when a defendant seeks an adjournment to retain counsel." Ibid. We outlined those factors in Furguson as follows:

> the length of the requested delay; whether other continuances have been requested and granted; the balanced convenience or inconvenience to the litigants, witnesses, counsel, and the court; whether the requested delay is for legitimate reasons, or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; whether the defendant has other competent counsel prepared to try the case, including the consideration of whether the other

counsel was retained as lead or associate counsel; whether denying the continuance will result in identifiable prejudice to defendant's case, and if so, whether this prejudice is of a material or substantial nature; the complexity of the case; and other relevant factors which may appear in the context of any particular case.

[198 N.J. Super. at 402 (quoting United States v. Burton, 584 F.2d 485, 490-91 (D.C. Cir. 1978)).]

"Trial courts have broad discretion in weighing the factors and striking the proper balance, and their decisions are entitled to deference on appeal." Maisonet, 245 N.J. at 566. Judges are "require[d] . . . to conduct a 'reasoned, thoughtful analysis'" of these factors when a defendant requests an adjournment to hire new counsel. Id. at 559 (quoting State v. Kates, 216 N.J. 393, 396-97 (2014)). "If a trial judge does not conduct the proper analysis . . . it may be necessary to reverse a [proceeding] and start anew." Id. at 560.

"[A] court may not require the Public Defender to assign new counsel to a defendant who was dissatisfied with the attorney assigned to represent him, absent a showing of 'substantial cause.'" State v. Coon, 314 N.J. Super. 426, 438 (App. Div. 1998) (quoting State v. Lowery, 49 N.J. 476, 489-90 (1967)). "[A]n irreconcilable conflict establishes good [or substantial] cause . . . ." State v. Coclough, 459 N.J. Super. 45, 55 (App. Div. 2019).

31

In <u>Coclough</u>, we held a defendant who merely expresses dissatisfaction with their attorney but fails to request the attorney's discharge and to represent themself or seek appointment of new counsel does not establish reversible error. <u>Id.</u> at 54-55. We also observed defense counsel did not inform the trial judge they were unable to proceed and concluded a dissatisfaction with counsel did not create a conflict of interest. <u>Id.</u> at 55-56.

We are constrained to reverse and remand defendant's request for new counsel for reconsideration because, other than indicating defendant's request was made too late, the trial judge neither explored defendant's reasons for wanting new counsel at the sentencing nor considered the <u>Furguson</u> factors. As we recounted, defendant twice stated he did not want his attorneys. Although defendant did not utter the magic words of asking the judge to appoint new counsel or state he was retaining private counsel of his own choosing, given his youth and modest education, we cannot ascribe this knowledge to him. For these reasons, this issue is remanded to the judge to apply <u>Furguson</u> and adjudicate defendant's request.

### B.

Finally, we do not reach the substance of defendant's sentencing arguments. This is because if defendant is granted new counsel, they may take

32

a different approach at sentencing, which may in turn change the facts presented at sentencing or the sentence itself.

Affirmed in part, and reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division